Argued February 20, modified and remanded March 18, 1919.

HAWKINS *v.* RODGERS.

(179 Pac. 563, 905.)

**Abatement and Revival—Another Action Pending—Priority of Other Action.**

1.   In a suit to strictly foreclose a land contract, a plea in abatement setting up that defendants, subsequent to the suit, brought an action at law against plaintiffs, was demurrable, it being in the nature of a *lis pendens.*

[As to abatement of one action by another pending in same state, see note in 84 Am. Dec. 452.]

**Pleading—Defenses and Counterclaims—Statement.**

2.   While a defendant may set forth by answer as many defenses and counterclaims as he may have, they must, under Section 74, L. O. L., as amended by Act Jan. 28, 1915 (Laws 1915, p. 24), be separately stated and refer to the cause of action which they are intended to answer in such a manner that they may be intelligibly distinguished.

**Vendor and Purchaser—Land Contract—Default.**

3.   Where payments were made out of time with the acquiescence and approval of vendors, there would be no default until after reasonable notice by vendors to vendees that in the future strict performance as to time and amount of payments would be required.

**Evidence—Actions to Foreclose Land Contract—Pleading and Proof.**

4.   Since under Section 713, L. O. L., a written agreement will be considered to contain all the terms agreed on and evidence of other terms is inadmissible, except where a mistake in writing is put in

issue by the pleadings, in a suit to strictly foreclose a land contract, a defense that a strip of land was not included in the contract as supposed by defendants could not be considered when not pleaded.

**Vendor and Purchaser—Land Contract—Default—Conditions Precedent.**

5. Where a land contract provides that plaintiff is to furnish an abstract, to be delivered contemporaneously with full payment of the purchase price, vendors cannot be put in default by the purchasers for failing to furnish a sufficient abstract until full payment of the purchase price is tendered.

**Vendor and Purchaser — Consideration — Modification of Written Agreement.**

6. A verbal agreement by the parties to a written land contract for the suspension of payments by purchasers until a certain road had been vacated did not modify the written agreement, in the absence of consideration.

**Vendor and Purchaser—Land Contracts—Rescission—Evidence.**

7. In a suit strictly to foreclose a land contract, where the defense of rescission was interposed, evidence *held* not to show a meeting of the minds of the parties as to the rescission.

**Vendor and Purchaser—Land Contracts—Default.**

8. In a suit strictly to foreclose a land contract, providing for payment within five years and for delivery of an abstract showing marketable title, the vendors were not in default, merely because they had no title to a strip of land included, where the five years provided for in the contract had not expired, notwithstanding that purchasers had exercised their option to offer payment before that time.

**Vendor and Purchaser—Land Contracts—Foreclosure—Allowance for Improvements.**

9. Where vendees under a land contract have erected improvements, the vendor on foreclosure of the contract may either take back the land, upon payment for improvements, or he may allow the property to be sold, in which case the proceeds should be first applied to pay what is due vendor, and the balance paid vendee.

From Lane: GEORGE F. SKIPWORTH, Judge.

Department 1.

This is a suit strictly to foreclose a contract whereby the plaintiffs, husband and wife, agreed to convey land to the defendant Hala Rice Rodgers. It is not necessary to say more about the defendant First National Bank than that it was the depository of the escrow involved in the transaction. The admitted written agreement between the parties was to the effect

that the defendants Rodgers were to pay to the plaintiffs $1,000 at the execution of the contract, which was acknowledged, and $9,000 additional on or before five years, with interest at 6 per cent per annum, as the purchase price of realty in Lane County, Oregon, described as follows:

"The lot numbered Sixteen and part of the lots numbered Fifteen and Seventeen of City View Park Addition to Eugene, in Lane County, Oregon, as platted and recorded, described as follows, to wit: Beginning at the Northwest corner of said Lot Sixteen and running thence South along East line of road 945.9 feet to the North line of Mulkey Cemetery; thence South 89° 17′ East 594 feet; thence North 961.0 feet to the South line of County road; thence along said South line of County road South 88° 29′ West 252.4 feet and thence South 89° 53′ West 431.7 feet to the place of beginning; containing 13 acres, more or less; also all our right, title and interest in and to the road 40 feet in width immediately West of said tract."

Rodgers and his wife were to have possession of the premises from April 1, 1912, as long as they complied with the terms of the agreement. They were to discharge all taxes and assessments when they should become due and payable, until the purchase money should be fully paid, and were to keep the buildings, fences and improvements in as good repair as they then were, excepting ordinary wear and damage by the elements. It was also stipulated that:

"The parties of the first part hereby agree and bind themselves, their heirs and legal representatives that in case the aforesaid sum of Nine Thousand Dollars, with the interest shall be fully paid at the times and in the manner above specified the said deed therefor shall be delivered to the said parties of the second part or their legal representatives, together with an ab-

stract of title showing good and substantial title to all of said lands.''

Finally, it was agreed that if Rodgers and his wife should fail to make any of the payments at the time and in the manner prescribed, or within sixty days after any payment of principal or interest should become due, or should fail to pay any tax or assessment against the land before it should become delinquent, the contract should be void, all payments thereon forfeited, the deed returned to the plaintiff and the possession of the property at once surrendered; or, in the alternative, the plaintiffs might elect to declare the whole of the purchase price due and payable and proceed at once by foreclosure or otherwise to collect the same, together with all reasonable costs, charges and expenses, including attorneys' fees.

The complaint alleges that E. H. Hawkins was the absolute owner of all the lands described; that they were free from encumbrance; that the deed as agreed upon was deposited with the bank as an escrow on March 2, 1912, the date of the contract, with proper instructions respecting its delivery; and that the plaintiffs have performed all of the conditions of the contract by them to be fulfilled prior to the final payment of the purchase price, and are now able, ready and willing to furnish the abstract as described, which is the only thing remaining for them to do. They say that no part of the purchase price has been paid except $1,000 at the execution of the contract and three annual interest installments of $540 each, paid respectively on April 2, 1913, April 30, 1914, and September 27, 1915. They charge that the interest due March 2, 1916, has never been paid; that the defendants failed, neglected and refused to pay the taxes for the year 1915, and to prevent the sale of the land for such de-

linquency, the plaintiffs were compelled to pay the same in the sum of $36.97, none of which has been repaid to them.   Reciting the fact that the sum of $9,000 with interest thereon at 6 per cent per annum from March 2, 1915, is due from the defendants Rodgers to the plaintiffs; that the suit is brought for strict foreclosure of the contract as against the rights, interest and claims of the defendants, and that $200 is a reasonable attorneys' fee, the plaintiffs pray for a decree of strict foreclosure.

As a plea in abatement to this complaint the defendants Rodgers say that on February 23, 1917, which was long after the institution of this suit, they brought an action at law against the plaintiffs, which may be described briefly as an attempt to recover all the moneys paid on the contract by the defendants, together with amounts they expended for buildings and fruit trees and cultivation thereof on the land during the time they occupied it, based upon an alleged mutual rescission of the contract first mentioned.   As a complete defense they admit the making of the contract and the payment of $1,000 on the principal, and the three payments of interest, the deposit of the deed in escrow, and that E. H. Hawkins is the absolute owner of the land so far as his wife, N. E. Hawkins, is concerned.   Otherwise the complaint is denied, except as stated affirmatively. They avow the making of the contract as alleged in the complaint; that they entered into possession of the property about April 10, 1912, and continued therein until early in January, 1917.   They aver the payment of principal mentioned and the three payments of $540 each as interest, and taxes amounting to $110, and say they disbursed certain sums of money for materials and labor in building a barn, for fruit trees, fences, buildings and cultivating an orchard, for work on a

lawn and for hauling gravel, amounting in all for improvements to $1,509.60. They say that the payments of principal and interest were accepted by the plaintiff E. H. Hawkins at the time they were made and were approved by the plaintiffs, by whose consent and approval also the improvements were made by the defendants.

Reciting the covenant to furnish an abstract, the defendants state:

"That the dwelling-house located on said land is in the northeasterly corner thereof; that the public road runs east and west on the north side of the said house and is actually located 48.4 feet from the said house; that there is a fence along the north (south) side of the said road as it is actually traveled; that when these defendants agreed to purchase the said land they believed that the plaintiffs were going to convey them the land up to the fence along the south side of the said road as the plaintiffs pointed out to these defendants that they owned the said land up to the said fence and that the same would be conveyed up to the said fence, when in truth and in fact there is a strip of land 14.2 feet wide along the south side of the said fence which the plaintiffs herein do not own, to which they have no title, and which belongs to and is part of the public road, and the south side of the said strip which belongs to the public road is only 34.3 feet from the said house, making the public road to come within 34.3 feet of the said house, and to the said strip 14.2 feet wide the plaintiffs have no title.

"That within the said strip there are some oak trees which are greatly appreciated by these defendants as shade trees; that when the said strip of land is opened for a road and the fence set back it will cause an embankment to be in front of the said house, cause the said public road to be within 34.3 feet of the said house, and destroy the said shade trees."

The answer narrates in substance that if the strip should be used for road purposes, the prevailing winds during the summer-time will cause a much larger quantity of dust to come into the house than at present, and that the dust annoys. It is further alleged in effect that after the defendants made the last payment of interest, and before the next installment was due, while the defendants were not yet in default, it was verbally agreed by the parties that the vendees were not to make any further payments until the plaintiffs had secured a vacation for road purposes and a title to the said strip of ground and had furnished an abstract showing clear title in the plaintiff E. H. Hawkins to all the land up to the fence; that he would procure the title to the said strip of road as a condition precedent to the defendants' being required to make any further payments; that the defendants relied upon the verbal modification and remained in possession, improving the land, and that the plaintiffs have never performed their promise about the vacation of the parcel, but instead have instituted this suit, as a result of all of which the defendants claim that the plaintiffs are estopped from disputing the validity of the oral modification of the written contract. They then charge that on or about December 20, 1916, the parties mutually agreed to and did rescind the contract, but that the agreement to rescind was not in writing. They state that the terms of the rescinding agreement were that the defendants should surrender the property to the plaintiffs, who would pay back to them all they had paid on the purchase price of the land, with interest thereon at 6 per cent per annum from the date of each payment; that they would return to the defendants all of the taxes and assessments paid by the latter and would pay to them the amount which the improve-

ments had added to the market value of the land, less the reasonable rental of the land during the defendants' occupancy.

They say they surrendered the property but that the plaintiffs have not paid the money mentioned. The defendants disclaim all interest in the land and the escrow deed and pray that the suit be dismissed; that they be relegated to their relief at law or that the suit be stayed until the action at law has been determined. They conclude by saying:

"The defendants ask no other relief than as herein prayed, as they elect to proceed in the said law action for their relief so soon as the court will allow the same to be done."

A general demurrer to the plea in abatement was sustained by the Circuit Court. On the motion of the plaintiffs the court struck out of the answer all the matter relating to the expenses for improvements, all that concerning payments made out of time with the knowledge and consent of the plaintiffs and that part treating of the location of the dwelling-house and the proximity of the public road, and the subsequent convention for the suspension of payments until the plaintiffs should secure a vacation of the road and an abstract showing full title in the plaintiffs to the strip mentioned. The grounds assigned for the motion were that the matter mentioned was irrelevant, immaterial and sham. The defendants stood upon their answer, notwithstanding an offer at the hearing to allow them to amend.

The reply denied the new matter remaining in the answer except as stated in the complaint. Further replying, the plaintiffs proceeded at great length and detail to narrate in substance that with intent to cheat and defraud the plaintiff E. H. Hawkins the defendants

enticed him into an office in Eugene and handed him a copy of the agreement whereby they claim to have rescinded the contract, after the commencement of this suit; that they afterwards abandoned the premises and that the plaintiffs for the protection of their interest therein took charge of them, merely for the purpose of preventing waste thereon and caring for the same.

· The findings of fact and conclusions of law were in favor of the plaintiffs and a decree was rendered strictly foreclosing the contract as against the defendants in default of their payment of the amounts charged to be due on the contract within ninety days from the date of the decree, and enjoining the prosecution of the action at law.    The defendants appeal.

MODIFIED AND REMANDED.

For appellants there was a brief and an oral argument by *Mr. H. E. Slattery.*

For respondents there was a brief over the names of *Mr. Charles A. Hardy* and *Mr. A. E. Wheeler,* with an oral argument by *Mr. Hardy.*

BURNETT, J.—We note at the outset that this is not a suit for specific performance, but is one of strict foreclosure, wherein the owner of the fee seeks to compel the vendee to pay the purchase price within a time fixed by the decree or abandon the undertaking.

1. The demurrer was properly sustained to the plea in abatement, it being in the nature of *lis pendens.* The equity court had obtained jurisdiction first in this suit for strict foreclosure wherein all the rights of all the parties can be fully and finally adjudicated; hence it is not permissible for any of the litigants to institute an action at law covering the very questions over

which the chancery tribunal had already rightfully assumed authority.

2, 3. A defendant is entitled to set forth by answer as many defenses and counterclaims as he may have, but it is required by Section 74, L. O. L., as amended by the act of January 28, 1915, that they be separately stated and refer to the cause of action which they are intended to answer, in such a manner that they may be intelligibly distinguished. It was proper for the defendants to allege a rescission by express stipulation of the parties, and the terms agreed upon for such a cancellation of the contract, including the amounts to be repaid by the plaintiffs. It was error, therefore, for the court to strike out the matter averring the payments made for improvements, and the like, for repayment of these amounts was part of the alleged conditions of the rescission agreement said to have been made by the parties. In abatement of the suit it was competent to state that the payments were made out of time with the acquiescence and approval of the plaintiffs, which, under the doctrine of *Graham* v. *Merchant*, 43 Or. 294 (72 Pac. 1088), and *Kemmerer* v. *Title & Trust Co.*, 90 Or. 137 (175 Pac. 865), and other like precedents, would postpone the operation of the default until after reasonable notice by the vendor to the vendees that in the future, strict performance as to time and amount of payments would be required. It was wrong to strike out that matter.

4. It is impossible to determine from the answer whether the strip is part of the tract described in the contract or something in addition thereto. If it was something further that was to be included in the contract, and not part of the tract therein described, it cannot be the subject of dispute here, in the absence of a showing that its omission from the written memo-

rial of the agreement was the result of fraud or mistake, for we learn in Section 713, L. O. L., that:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except in the following cases:—

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings. * * "

It would be another matter if by appropriate narration it should appear that the plaintiffs represented to the defendants as a means of inducing the latter to make the contract, that the north line of the premises described in the instrument coincided with the fence mentioned but it is not so pleaded.

5, 6. Respecting the matter of furnishing an abstract, the terms of the agreement are that that instrument shall be delivered contemporaneously with the full payment of the purchase price, and the plaintiffs could not be put in default by the defendants until the latter had tendered the money required. So far as the alleged verbal agreement that the defendants should suspend payments until the plaintiffs had secured a vacation of the road and furnished an abstract to that effect is concerned, it is not alleged to have been made on any consideration and, hence, cannot have any value as a contractual modification of the original agreement. On the other hand, under the authority of *Neppach* v. *Oregon & California R. R. Co.*, 46 Or. 374 (80 Pac. 482, 7 Ann. Cas. 1035, and note), if the plaintiffs represented to the defendants that they need not make payment until the vacation of the strip was accomplished, etc., and thereby lulled them into a sense of security it would operate to stay the hands of plain-

tiffs until the matter was again set at large by reasonable notice that a strict performance of the contract by the defendants would thenceforth be required. The matter stricken out was at least amenable to a demurrer on the ground that the several defenses were not separately stated, but, including as it did matters properly cognizable as part of the alleged rescission agreement, the *omnibus* motion to strike out should have been overruled even as to matters defectively pleaded, against which it was directed. With these observations, we pass to a consideration of the testimony concerning the alleged mutual agreement of the parties to rescind the contract.

We premise that, as in any other contract, the minds of the parties must meet on an identical proposition which they both understand alike and to which they both assent in the same sense; otherwise, there is no agreement. It appears by the testimony that there had been some negotiations between the parties on the subject and that the plaintiff E. H. Hawkins had offered the defendants $250 to surrender possession of the premises and cancel the contract. This, however, had not been accepted and this suit had been instituted; after which, the defendant wife, Mrs. Rodgers, made an appointment by telephone to have Mr. Hawkins meet her at a real estate office in Eugene at a certain time. Going there, Hawkins found Mr. Rodgers in the outer office, while the latter's wife was in an inner room. After some delay they called Hawkins into the latter room, when, to quote in substance the testimony of both Rodgers and his wife, Mrs. Rodgers told Hawkins that they had decided to rescind the contract and to give immediate possession of the place, at the same time handing him their copy of the con-

tract. They say that he took it and said, "All right."
Rodgers testified further as follows:

"Q. Did Mr. Hawkins ask you anything about what
amount of money you would accept or anything like
that?

"A. He asked me if we accepted what he offered; I
told him no, we wouldn't accept that.

"Q. What did he say?

"A. He said, 'Well, I will be willing to pay some-
thing.'"

He says they gave possession about January 10th,
following, and that he saw the plaintiff E. H. Hawkins
afterwards working on the place.

Mrs. Rodgers testified substantially as related and
as follows:

"Q. When you handed Mr. Hawkins your copy of
the contract between yourself and your husband on the
one side, and the plaintiffs Hawkins and wife on the
other, and made your statement, you then turned to
leave, and left the room?

"A. Yes.

"Q. Were you afraid he might hand it back to you?

"A. No, sir. I was sitting there. I had no further
business in there. I had business with Mr. Peterson.

"Q. You were done and you left?

"A. Well, I don't think there were any words passed
between me and them. I immediately got up as Mr.
Skotheim did, and started to walk out of the door. I
did not go clear out. I was standing just outside of
the door, waiting.

"Q. You handed him this paper and made your
statement simultaneously, didn't you?

"A. Not so much so. I told him we had decided to
rescind the contract, and handed it to him.

"Q. And turned and walked off?

"A. I was sitting down. I sat there for a second or
two, and there was nothing said and I got up and
walked out.

"Q. Then you were ready to leave right then and there and have nothing further discussed between you?

"A. It was not necessary that anything more should be said.

"Q. When you handed him the paper and made your little speech, you were done, is that the idea?

"A. Comparatively. Not done. I expected something back.

"Q. But there was no further conversation?

"A. I had no further conversation with Mr. Hawkins; no, sir.

"Q. That settled that phase of it so far as you were concerned?

"A. Yes, sir.

"Q. There was no occasion for any further discussion; is that right?

"A. I didn't see that there was."

E. H. Hawkins testified that when he met Mrs. Rodgers in the inner office, she said, "This is a copy of the contract. We give up the place"; that he did not hear her use the word "rescind" and that he would not have known what she meant by it if he had heard it. He says that Mrs. Rodgers "got up and stood through the door between the rooms," and further testifies:

"Q. What did you do then?

"A. I asked Mr. Rodgers if they were going to hold me to my agreement to give them two hundred fifty dollars; he didn't answer, and she turned around and said, 'No, we won't accept it.'

"Q. Then what did you do?

"A. Well, I thought, 'Perhaps you won't get anything else.'

"Q. What else did you do?

"A. I don't think I did anything else. You know it was Rodgers that I spoke to. I asked him if they accepted it, and he didn't answer, but she did.

"Q. What did you refer to when you asked about the $250?

"A. I referred to the conversation that I had had a few days before up there, when I told him if they would give up the place and give me full possession, I would give them two hundred fifty dollars.

"Q. Was that before or after suit was brought?

"A. I think it was before.

"Q. Now, after this suit was brought in this court, have you had any more dealings with the Rodgers?

"A. I have not.

"Q. Mr. Hawkins, did you make any arrangement with them at all that day there in the office, of any kind?

"A. No.

"Q. Did you know or understand what they meant or what they were trying to do?

"A. I did not."

7. From the testimony of the defendants themselves it is quite apparent that there was no meeting of the minds of the parties on the question of contractual rescission, and that we are safely within the record in saying that no such rescission was made. Not a word was said about the repayment of the moneys expended in improvements, such as lawns, orchards and the like; neither was there any statement whatever about the return of the payments on account of principal, interest and taxes, although the contract itself states that these shall be forfeited on the default of the vendees, yet all these are averred to be part of the agreement to rescind upon which the defendants rely. The alleged contract of rescission by mutual agreement must be laid out of the case for an utter failure of proof.

Respecting the claim that the plaintiffs had no title to the strip of land, the bone of contention here, and granting that it was to be included in the contract or was part of the land described, and that the title of the plaintiffs is at present defective in the respect contended, we find in 39 Cyc. 1410, the following rule:

91 Or.—32

"The American decisions have uniformly held that the vendor cannot be placed in default for defect of title or inability to convey, by tender of performance by the purchaser and demand for performance by the vendor before the expiration of the time fixed by the contract for making a conveyance, the view being taken that it is perfectly legal for one to contract to convey title to land which he does not own. If the title is defective, or if he has no title, at the time of entering into the contract, but such defects are cured at the time fixed for performance, or before any demand for title was made, or at any time before suit commenced to rescind, or before or during the trial of a suit or cross-bill by the purchaser to rescind the contract, or before final decree, a rescission will not be permitted, provided there has been no unnecessary delay or fraud on the part of the vendor by which injury accrues to the purchaser. And it has been held that even in case of injury caused by delay in making good the title, a rescission will not ordinarily be granted if compensation can be made therefor."

A leading case is *Hanson* v. *Fox,* 155 Cal. 106 (99 Pac. 489, 132 Am. St. Rep. 72, 20 L. R. A. (N. S.) 338). It is not pretended that the defendants offered to pay the balance remaining due on the purchase price. We remember that the contract prescribes that they may pay this on or before five years from the date of the instrument. Even if they had exercised their option to offer payment before the maturity of the contract, still, having thus anticipated the time of payment, the plaintiffs would have a reasonable time thereafter in which to furnish the marketable title.

8. It is plain upon the record, under these principles, that the plaintiffs were not in default respecting the strip and the defendants were in no position to force rescission. On the other hand, if in fact the plaintiffs did not have title to the land they undertook to con-

vey, they had no standing to declare and enforce a default against the defendants, for the obligations of the parties are mutual and concurrent, and, as in any other such stipulation, neither can enforce a rescission against the other unless he is at the time himself able to perform. Again, as stated in *McCourt* v. *Johns,* 33 Or. 561 (53 Pac. 601), the contract will not be rescinded for failure of title to an insignificant portion of the premises. A slight defect in quantity of property ought not to be used as a cover for the consequences of extravagant speculation. This subject is treated at length in *Charles B. James Land & Investment Co.* v. *Vernon,* 129 Tenn. 637 (168 S. W. 156, 52 L. R. A. (N. S.) 959, and note).

On the subject of improvements the books afford a variety of precedents and it is impossible to lay down any hard-and-fast rule. It is made the subject of statute in Georgia to the effect that a trespasser may set off permanent improvements enhancing the value of the land as against the claim for use and occupation. A similar provision is found in our Code in Section 330, L. O. L., where the defendant in ejectment is entitled to set off against damages for the withholding of the premises, the value of permanent improvements made upon the property while holding under the color of title adversely to the claim of the plaintiff in good faith. This, however, relates to actions at law. It is held in *Seymour* v. *Cleveland,* 9 S. D. 94 (68 N. W. 171), that a vendee is not an adverse holder in good faith under contract to purchase so as to secure compensation for improvements under the statute of that state. In *Putnam* v. *Ritchie,* 6 Paige (N. Y.), 390, the mother of certain defendants who were heirs of a deceased tenant under a long lease surrendered it without authority. The landlord made improvements on the

premises and after the heirs came of age and asserted their title under the lease of their ancestor they were permitted to enjoy the improvements made, without compensating the landlord. In *Rainier* v. *Huddleston,* 4 Heisk. (Tenn.) 223, the party who made the improvements while in possession of property under an oral contract for the purchase thereof was found to be himself in default and was refused compensation for the improvements. In *Banks* v. *McQuatters* (Tex.), 57 S. W. 334, it is held that where the vendor is not in default and the vendee is, the latter cannot tax the former with the value of improvements when he tries to recover his land. In *Guthrie* v. *Holt,* 9 Baxt. (Tenn.) 527, it is said that where a vendor is not in fault and the vendee is remiss in performance, the latter cannot compel payment for improvements. It is analogous to the situation in *Caro* v. *Wollenberg,* 83 Or. 311 (163 Pac. 94), where we held that a mortgagee in possession could not, without the consent of the mortgagor, load the premises with permanent improvements so as to increase the burden of the mortgagor on redemption.

9. The feature common to both situations is that in each the individual making the improvements is putting them on the land of another. They are differentiated by the fact that it was not originally directly within the scope of the contract that the mortgagee should have title to the land, while, on the other hand, the very purpose of the agreement was ultimately to pass title to the vendee. It is plain on principle that a defaulting vendee cannot install expensive improvements upon the realty and compel the vendor to pay for them absolutely and at all events. It is equally equitable that the vendor cannot justly avail himself unrestrictedly of the benefit of the vendee's labors and

expenditures which really enhance the value of the estate. It is believed that the more reasonable and equitable rule is stated in *Lytle* v. *Scottish American Mortgage Co.*, 122 Ga. 458 (50 S. E. 402). It is true that in a sense the decision there is aided by the Georgia statute already noted, but after treating of the duty to make compensation for improvements in some manner, the court, speaking by Mr. Justice LAMAR, says:

"This does not lead to the conclusion that the vendor can be compelled to pay for costly changes which he did not order and does not desire, and which, though valuable, are not of a character useful to him. Such a result is obviated by the terms of the decree. If the vendor elects to take back the land, he must return the purchase money less damages and rent. If the land has been improved, he must allow the vendee for the enhancement in value occasioned thereby, before he can take the land thus improved. But the vendee cannot force the vendor to pay for the building or other meliorations. When the vendee asks compensation therefor, another factor is injected into the case, whereby he loses the absolute right to the purchase money and forces an accounting under which he can secure only what legally comes to him on a sale of the property. The rights of the parties must be adjusted; and upon the vendor's paying the vendee what is equitably due for improvements and return of purchase money, the vendor has the option to take the land under the terms of the rescinded contract. If he does not desire to exercise this option, the property should be sold, the proceeds should be first applied to the payment of what is due the vendor, and the balance should be paid over to the vendee. In this way the rights of both parties are fully preserved. The vendor is not obliged to buy the improvements, though to protect his interest he may use his special judgment against the land as cash at the sheriff's sale. At the sale the vendee also

may get the benefit of the enhanced price due to the improvement.''

See, also, *Moore* v. *Giesecke,* 76 Tex. 551 (13 S. W. 293).

The object of this suit is to establish a price which the defendants must pay or be foreclosed and excluded from the premises. Some payments have been made and it is stipulated in the contract that these are forfeited if the defendants shall make default. It is said in 39 Cyc. 2004:

''However, the terms of the contract itself, or the purchaser's own conduct or default, may work a forfeiture of such payment, thereby depriving the purchaser of his right to recover the purchase-money paid''; citing many authorities.

The defendants agreed to pay a balance of $9,000 and interest. This is subject to possible deductions on account of defect in title to the 14-foot strip mentioned, if it be true that the title is defective. The defendants are entitled to litigate this question under proper pleading. The record before us is not sufficient to enable us to determine that matter.

It is possible that the road was initiated under the law as it stood prior to the act of February 24, 1903 (Laws 1903, p. 262), rendering it amenable to Section 4821, B. & C. Comp., providing that

''if any part of any road in this state shall not be opened for four years after or from the time of its location, the same shall become vacated.''

Again, title by prescription may have been acquired up to the line of the fence prior to the enactment of Section 6372, L. O. L., preventing adverse user, however long continued, from becoming the basis of title to land within the lines of an established county road. It may be, too, that the proceedings by which the laying

out of the road was attempted were so defective that the highway itself exists only by prescription and covers only the ground actually occupied by public travel. All these questions may be involved and are worthy of examination.

If the defendants are found to be entitled to a deduction under such cases as *McCourt* v. *Johns,* 33 Or. 561 (53 Pac. 601), the net remainder will be the price to be charged against them on strict foreclosure, and a decree should be entered by the Circuit Court allowing them a reasonable time, to be fixed by that court, in which to pay the balance thus computed. The decree of the Circuit Court should also provide that in default of payment as prescribed the land should be sold and the proceeds of sale applied to the payment of the balance of the purchase price and taxes thus ascertained, and that the overplus, if any there be, shall be paid to the defendants Rodgers. In this way, the defendants will get the benefit of whatever enhanced value they have conferred upon the land, for it will be reflected in the public sale and will be an inducement to bidders to purchase. On the other hand, the plaintiffs may protect their interest by bidding at the sale and making the property bring enough to satisfy their claim for purchase price. The plaintiffs agreed to sell. In that respect their contract would be carried out by means of the public sale and they cannot complain. The defendants agreed to buy and pay a purchase price. They have the option of paying the adjusted price and taking the land. They also have the alternative of allowing it to go to sale where their supposed betterments will possibly attract bidders who will give more for the land than if there were no improvements upon it.

At best, the acquiescence in making payments out of time and the alleged excusing of the defendants from making further payments until settlement about the strip, would amount to matter in abatement, which was waived by the parties' submitting themselves to the jurisdiction of the court upon the merits of the controversy. The decree must be modified and remanded to the Circuit Court with leave to that tribunal to grant permission to the defendants to amend their pleadings with reference to the alleged defect in title, with a view of ascertaining the truth of that matter and of making a proper abatement of the purchase price in the calculation of the amount which the defendants must pay to avoid strict foreclosure. A similar solution was worked out in *Bickel* v. *Wessinger,* 58 Or. 98 (113 Pac. 34), and is in line with the doctrine taught in *Flanagan Estate* v. *Great Central Land Co.,* 45 Or. 335, 343 (77 Pac. 485, 488), where Mr. Justice WOLVERTON, delivering judgment, said:

"It does not follow, however, that the court will always declare a strict foreclosure of the contract. It may also decree a foreclosure by a sale of the land in the ordinary way, although the title has not passed from the vendor, dependent upon the exigencies and the equities of the case"; citing *Security Savings Co.* v. *Mackenzie,* 33 Or. 209 (52 Pac. 1046).

As equity acquired jurisdiction over the parties and the subject matter before the commencement of the action at law, the latter proceeding should be permanently enjoined and the whole matter worked out to final solution in this suit. The result attained by this process will be a foreclosure of the contract on equitable principles. The performance of the terms of such a decree will operate to leave the parties where it found them, each exonerated from obligation to the

other, and that will be a veritable rescission.   The decree is therefore modified in accordance with the principles indicated, and the suit is remanded to the Circuit Court for further proceedings, neither party to recover costs or disbursements in this court.

MODIFIED AND REMANDED.

McBRIDE, C. J., and BENSON and HARRIS, JJ., concur.

---

Denied April 15, 1919.

ON PETITION FOR REHEARING.

(179 Pac. 905.)

Petition for rehearing denied.

*Mr. H. E. Slattery,* for the petition.

*Mr. C. A. Hardy* and *Mr. A. E. Wheeler, contra.*

In Banc.

BENSON, J.—Counsel for appellants presents a number of propositions upon which it is urged that a rehearing should be granted.   The first of these to be considered calls our attention to the following quotation from the opinion:

"The *omnibus* motion to strike out was rightfully overruled even as to the matter defectively pleaded."

This, of course, was a clerical error, regarding which steps have already been taken toward making the necessary correction in the published reports.   The statement of the case, preceding the opinion, shows that the writer clearly had in mind the true disposition of the motion.   What the court intended to say was:

"The *omnibus* motion to strike out, should have been overruled even as to matters defectively pleaded."

It is also strenuously urged that the evidence abundantly establishes the rescission of the contract. Upon this point it may be said that counsel refuses to distinguish a rescission by agreement of the parties from a rescission brought about by operation of law. As clearly pointed out by Mr. Justice BURNETT, in the former opinion, a rescission by agreement of the parties is a contract, and before the contractual relation can exist, there must be a meeting of the minds upon the terms of the agreement, or there is no contract resulting from the negotiations. We therefore repeat that the evidence discloses affirmatively that the parties did not understand the terms alike, and did not, in fact, agree upon the terms of a rescission. It follows that a mutual rescission, such as is pleaded by the defendants was not proven.

The other questions discussed in the petition are sufficiently considered in the former opinion.

A rehearing is denied.

MODIFIED. REHEARING DENIED.